IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ERIC LOCKHART,<br><br>           Petitioner,<br><br>   vs.<br><br>TONY HEDGPETH, Warden,<br><br>           Respondent.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. C 08-2935 JSW (PR)

**ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS AND
CERTIFICATE OF APPEALABILITY**

**INTRODUCTION**

Petitioner, a prisoner of the State of California, has filed a habeas corpus petition pursuant to 28 U.S.C. § 2254.  Respondent was ordered to show cause why the petition, setting forth eleven claims, should not be granted.  Respondent filed an answer to the petition, and petitioner filed a traverse.  Petitioner was then granted a stay in order to exhaust one more claim in state court, and after he did so, the stay was lifted and the petition amended to include the new claim.  Thereafter, Respondent's motion to dismiss the new claim on the grounds of procedural default was granted.  Petitioner's original eleven claims are now addressed, and for the reasons discussed below, the writ is DENIED.

# BACKGROUND

## I.    Procedural Background

A jury in Alameda County Superior Court found petitioner and his co-defendant Antonio Harris guilty of first-degree murder with the special circumstance that the murder was committed during the commission of a robbery.  The jury also found true allegations that Petitioner was armed with a firearm.  On December 12, 2003, the trial court sentenced Petitioner and Harris to life in prison without the possibility of parole. The California Court of Appeal affirmed, and the Supreme Court of California denied review.  Petitioner filed unsuccessful habeas petitions in all three levels of the California courts.

## II.    Factual Background

The California Court of Appeal summarized the facts and procedural background of the case as follows:

> An amended information charged Lockhart and [co-defendant] Harris with the murder of Gerald Brown (Cal. Penal Code § 187) and the special circumstance that they committed the murder while engaged in the commission of a robbery (§ 190.2, subd. (a)(17)(A)). It was further alleged that they were armed with a firearm (§ 12022, subd. (a)(1)), that Harris had three prior felony convictions and a prior prison term (§ 667.5, subd. (b)), and that Lockhart had one prior felony conviction.
>
> A.    MOTION TO SEVER
>
> Lockhart filed a motion to sever his trial from Harris's, or to redact or exclude three statements made by Harris to the police. (See [People v. Aranda, 65 Cal.2d 518 (1963)]) Harris joined in Lockhart's motion, seeking to exclude his own statements. After the prosecutor agreed not to introduce two of Harris's statements that directly implicated Lockhart by name, the trial court concluded that the third of Harris's statements contained no reference to Lockhart or his existence. On this basis, the court ruled that the admission of the statement would not abridge Lockhart's Sixth Amendment rights and denied the severance motion. The court again denied Lockhart's motion to sever when reargued about three weeks later, and the matter proceeded to trial.
>
> B.    PROSECUTION CASE
>
> Brown was found shot to death in his car in front of his Oakland residence just after midnight on May 15, 2000. The prosecution's theory

was first degree felony murder: specifically, that Brown was shot while Lockhart and Harris were robbing him.

1.      Pauline Coleman's Testimony: The Plan to Rob Brown

Over a number of years, Pauline Coleman and Lockhart lived together, had a child, and used drugs including cocaine, powder heroin, and methadone. Lockhart gave Coleman a ring and asked her to marry him, but in 1998, they pawned the ring at Maxferd's Jewelry store to pay bills and buy drugs. Toward the end of 1999, they had an off-and-on relationship, and Lockhart moved out to live with someone else.

Coleman and Lockhart frequently purchased rock cocaine from victim Brown. At times, Brown drove to Coleman's house in a white car to deliver the cocaine, but twice Coleman and Lockhart picked up drugs from Brown at his home at 5555 Bancroft Avenue in Oakland. Coleman paid Brown for the drugs with cash or, as Lockhart discovered by March 2000, with sex. In addition, Coleman introduced Brown to Lakisa Boatley, a friend with whom she used drugs on a regular basis. Boatley became Brown's girlfriend.

On one occasion, Brown fronted Coleman $25 worth of drugs in exchange for a pendant, which he kept as collateral. Coleman could regain the pendant only by paying Brown $50, which they agreed she would do in April 2000. When the money was due, however, Coleman was in jail. When she had not paid by May 1, 2000, Brown increased the debt to $75 and pressured her to pay.

On the afternoon of May 14, 2000, Lockhart called Coleman and said he was coming over to pick up his clothes. Late that evening, he arrived in a burgundy Falcon driven by "Rod" Albritton, Boatley's former boyfriend. Lockhart got his clothes from the house and went back outside with Coleman. Privately, he asked her whether Brown was "still rolling" (selling drugs) and indicated that Brown would be easy to rob and he was thinking of doing so. Lockhart also said he might beat Brown up. Earlier that year as well, Lockhart had told Coleman that Brown would be easy to rob.

Lockhart asked Coleman to telephone Brown and get him out of his apartment so Lockhart could rob him. Coleman proposed that she call Brown about the money she still owed, explaining how she now owed $75. Appearing "pissed," Lockhart claimed the pendent was worth more than she got in drugs and she should not have pawned it, especially since she was already giving Brown sex for drugs. At Lockhart's suggestion, Coleman agreed to call Brown, at a time of Lockhart's choosing, and tell Brown she would meet him at the Vintage Inn with $50 of the $75. Lockhart said he had a gun, and although he did not show it to her, she had seen him with a gun previously. In discussing the robbery plans, Lockhart referred to "me and my partner," gesturing to Albritton in the car. After his conversation with Coleman, Lockhart left with Albritton.

Twenty minutes later, Coleman telephoned Brown to see where he

3

was. During the conversation, Coleman's call-waiting line clicked; she answered the other line and found it was Lockhart, who told her not to tell Brown to meet yet. She complied. About two hours later, Coleman received another call from Lockhart, instructing her to set up the meeting with Brown. Ten minutes later, Lockhart called again and, finding that Coleman had not yet telephoned Brown, became irritated and directed her to do so.

Coleman called Brown at his house. Boatley answered the phone, and Coleman asked to speak to Brown. Coleman told him she had $50 of the $75 and could meet him at the Vintage Inn. He agreed to meet her in five minutes.

About thirty minutes later, Coleman received a call from Brown at the Vintage Inn, asking where she was. Coleman claimed the person who was supposed to bring her the $50 had not arrived. They did not speak again.

2.    Enzore Savage's Testimony: Observation of Lockhart and Harris

Enzore Savage, maintaining that he was testifying against his will and that he feared Lockhart and Lockhart's brother, Michael, recounted his observations the night of May 14. Hearing voices outside his apartment near 5555 Bancroft Avenue, he went outside and saw two men sitting at the side of the building. Savage asked what was going on, and one of the men replied they were not doing anything. Savage returned to his apartment. At trial, he stated that the two men were Harris and Lockhart.

An hour or so later, Savage heard a sound like "rapping" on a steel door. He looked out his bedroom window and saw Harris standing at the passenger side of a light-colored Lincoln (which, it was later determined, belonged to Brown). Lockhart was standing about 20 yards away from Harris. A blue Cadillac was parked nearby. Lockhart said to Harris, "Come on, let's get the fuck out of here." Harris walked away. The car door of the Lincoln was left open.

On the night of the shooting, Savage gave police a physical description of the two men but did not say he recognized them. In a May 22, 2000 lineup, he identified Harris as the person standing closest to the victim's car. In a later lineup, Savage recognized Lockhart but did not tell police, indicating instead that two others in the lineup might have been one of the perpetrators. At the preliminary hearing, consistent with his trial testimony, Savage admitted that he had known Lockhart for 15 years and recognized him as one of the perpetrators, but placed Harris as the one closest to Brown's car.

3.    Frankie Lee Bonner: Gunshots and Harris's Blue Cadillac Near Brown's Car

At about 11:05 p.m. on May 14, Frankie Lee Bonner saw from her apartment at 5555 Bancroft Avenue a blue Cadillac "that didn't belong on the block" drive by. Around midnight, she heard six to eight gunshots.

Looking out her window, she called the police and observed the same blue Cadillac return, pull next to a white car, and then speed away. The door to the white car was open, and a leg was hanging out. There were (bullet) holes in the car windows and door.

    4.    <u>Officer Thurston and the Contents of Brown's Car</u>

At approximately midnight, Oakland Police Officer D'vour Thurston was dispatched to 5555 Bancroft regarding a possible shooting. Inside the white Lincoln, the officer observed a man, later identified as Brown, on his stomach across the passenger seat. He had been shot several times.

Brown's leather coat, wallet, and briefcase were visible inside the car. Brown had $21 in cash in the front pocket of his shirt. Drugs and a nylon bag, containing more money, were also found in the car.

    5.    <u>Officer Medeiros's Testimony: Police Investigation</u>

Oakland Police Sergeant Brian Medeiros arrived at the scene at 1:15 a.m. on May 15. He determined that Brown, Boatley, and Carnell Melton lived together in the apartment complex at 5555 Bancroft Avenue, where Brown's Lincoln was parked.

The police walked across the street to Savage's apartment and interviewed him. Savage's subsequent written statement, which was read to the jury at trial, gave an account consistent with his trial testimony. Medeiros confirmed that Brown's white Lincoln was observable from Savage's bedroom window in a well-lit area.

At the scene, Boatley advised police that Coleman had telephoned Brown just before he left his apartment. In a search of Brown's room, police found Coleman's name, phone numbers, and address.

Sergeant Medeiros and Sergeant Lou Cruz interviewed Coleman later that day at the police station. Initially, Coleman admitted making the telephone call to Brown but denied any involvement in a robbery. She claimed a friend named Seth agreed to give her $50 to pay Brown for the narcotics he fronted. She called Brown and told him to meet at the Vintage Inn, but Seth "stood her up." After Sergeant Medeiros accused Coleman of lying and withholding information, she admitted that Lockhart had asked her to tell Brown she would meet him at the Vintage Inn, but she denied her role was to get Brown out of his apartment. Eventually, Coleman admitted that Lockhart told her to call Brown as a means of luring him out of his apartment in order to rob Brown, adding that Lockhart first talked about robbing Brown when he found out Coleman had been sleeping with him. As Sergeants Medeiros and Cruz drove Coleman home, she stated that Lockhart had asked if she wanted to be there for the robbery, but she had declined.

    6.    <u>Further Testimony From Coleman: Lockhart's Admission</u>

On May 16, after Coleman had been questioned by police, she received a telephone call from Lockhart. When she said she did not want to speak with him, Lockhart said he was sorry and "it wasn't supposed to happen like that." He claimed the gun jammed and "went off." When Coleman warned Lockhart that the police were looking for him, Lockhart responded: "They don't know it's me." Coleman replied, "They do."

7.   Harris's Cadillac Located

On May 18, 2000, Sergeant Medeiros contacted and interviewed Albritton, who described Harris's vehicle and claimed it was located at an address on 32nd Street in Oakland. The next morning, Sergeant Medeiros went to the location and observed a 1981 light blue Cadillac, matching the description of the car seen at the time of the murder. Sergeant Medeiros confirmed that the Cadillac was registered to Harris.

8.   Harris's Statement to Police

On May 19, Sergeant Medeiros and another officer interviewed Harris. In a taped interview played for the jury, Harris stated that around 11:30 p.m. on Sunday (May 14), he drove to 55th and Bancroft, knowing a robbery was going to be committed and expecting to receive $150 to $200. Shortly after arriving, he heard gunshots and drove away.

9.   Lineups of Harris and Lockhart and Savage's Identification

In a physical lineup on May 22, 2000, Savage identified Harris as the man who stood by the passenger door of Brown's white Lincoln.

Lockhart was arrested the next day. In a six person lineup including Lockhart, Savage indicated two of the people might have been one of the perpetrators; neither of them was Lockhart. Three weeks later, however, Savage called Sergeant Medeiros, stated he remembered Lockhart, asked if Lockhart was in position number one in the lineup (Lockhart was actually number three), and claimed he was afraid of Lockhart's older brother Michael.

10.   Joshua Litz's Testimony: Harris Pawned Brown's Jewelry

Joshua Litz, the manager of Maxferd's Jewelry, testified that on May 15, 2000, at 12:44 p.m.-about 12 hours after Brown's death-Harris produced a California's drivers license and thumb print for identification and pawned four pieces of jewelry. Coleman, Boatley, and Melton identified the jewelry as Brown's. The police crime laboratory concluded that fingerprints on the Maxferd's pawn slips belonged to Harris. According to Maxferd's records, Lockhart and Coleman had previously done business there as well.

11.   Autopsy and Bullets

An autopsy determined that Brown had sustained two gunshot wounds to the upper left chest and one to the back of the left forearm and

6

that multiple bullet wounds were the cause of his death. Four cartridge cases found in Brown's Lincoln were .380 auto caliber and had been discharged from the same firearm. Two bullets, one recovered from Brown's body, were also .380 auto caliber and fired from the same gun. The gun was not recovered.

### 12. Intimidation of Witness Boatley

On July 17, 2000, Alameda County Sheriff Deputy Wellington Wong was dispatched to a San Leandro residence and spoke to Tonisha (a relative of Boatley), who showed him a possum, human feces, and a note that were left at her front door. The note read: "Keysa, snitch ass bith [sic]." Tonisha stated that Keysa (Boatley) had been staying there after Brown's murder.

At trial, Boatley asserted that she was afraid to testify because of the note. She acknowledged that Lockhart had not threatened her directly.

### 13. Efforts to Secure Savage's Testimony

On September 23, 2003, investigator Clint Ojala served an arrest warrant on Savage to secure his availability for trial. Savage became very upset and stated he was not going to court. Further, he claimed, since Lockhart's brother Michael had been released from prison, he had received threats at his house and was afraid for his family if he testified. Savage was sure that if he testified he or his family would be killed.

### C. APPELLANT LOCKHART'S CASE

Lockhart did not testify. He called as a witness Oakland Police Officer Deandrea Vantree, who described her interview of Boatley on May 15, 2000. In the interview, Boatley claimed the shooting occurred between 12:30 and 12:45 a.m., and did not mention Coleman's name or that Brown had received any telephone calls that evening.

Oakland Police Officer Christopher Bolton testified that he spoke to Melton on May 15, and Melton did not say whether Brown had indicated he was going out that evening. In her statement to police, Melton said she was not awakened by any disturbances that night.

Lockhart also introduced several witnesses who vouched for his reputation for honesty and nonviolence. In addition, it was stipulated that Lockhart was convicted in 1990 for the felony sale of narcotics (Health & Saf. Code, § 11352).

*People v. Lockhart*, No. A105200, 2006 WL 1280643, **1-6 (Cal. Ct. App. May 10, 2006) (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or

sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322 at 340. When there is no reasoned opinion from the highest state court to consider

8

the Petitioner's claims, the Court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991).

# ANALYSIS

The petition raises the following ground for relief: (1) the admission of Harris's confession violated Petitioner's right to confront witnesses against him;[1] (2) the admission of evidence of threats without a limiting instruction violated Petitioner's due process and Sixth Amendment rights; (3) there was insufficient evidence to support Petitioner's conviction;[2] (4) trial counsel was ineffective in failing to raise the insufficiency of evidence; (5) the admission of a suggestive identification of Petitioner violated his rights to due process; (6) trial counsel's cross-examination of witnesses regarding Savage's identification of Petitioner was insufficient; and (7) Petitioner's constitutional rights were violated by a "biased" jury and the denial of his requests for transcripts and records.

1.   Right to Confrontation

In his first and second claims, Petitioner argues that the admission of the confession of his co-defendant Harris violated his Sixth Amendment right to confront witnesses against him.  First, he claims the evidence was testimonial hearsay barred by *Crawford v. Washington*, 541 U.S. 36 (2004), and second he claims that the confession implicated him as the leader and perpetrator of the crimes and thus barred by *Bruton v. United States*, 391 U.S. 123 (1968).

Harris made three separate tape-recorded statements to the police on May 19, 2000 confessing to his involvement in the crimes.  The trial court excluded the first two statements under *Bruton* because they directly implicated Petitioner.  The trial court admitted Harris's third statement, however, because it did not refer to Petitioner.  The

---

[1]Claims one and two in the petition are treated together in claim one here.

[2]Claims four, five and six in the petition are treated together in claim three here.

9

third statement was as follows:

> Harris's third taped statement to police-the one played to the jury at trial-was recorded at 11:32 p.m. and ended at 11:35 p.m. According to Sergeant Medeiros, the intent was to delete any reference to Lockhart in this statement and avoid problems under Aranda-Bruton. In pertinent part, the interview proceeded as follows: "[SERGEANT MEDEIROS]: Okay. We're just going to ask you a couple of questions. All we want is yes-or-no answers, okay? All we want is just yes or no for the tape, okay? The first question would be-and this is going back to Sunday night-(unintelligible)-about what time was it, just so I can ask the question? [¶] [HARRIS]: I believe about 11:30 or something. [¶] [SERGEANT MEDEIROS]: 11:30? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: On this past Sunday night at 11:30 p.m., you drove to the area of 55th and Bancroft, knowing a robbery was going to be committed, in which you had the expectation of receiving 150 to $200 cash? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: Shortly after arriving, you heard gunshots? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: Immediately after the shots, you drove away, correct? [¶] [HARRIS]: Yeah. [¶] SERGEANT MEDEIROS: Sergeant Cruz, any questions? [¶] SERGEANT CRUZ: I don't have anything. [¶] [SERGEANT MEDEIROS]: Is that the truth? [¶] [HARRIS]: Yes. [¶] [SERGEANT MEDEIROS]: Okay."

*People v. Lockhart*, 2006 WL 1280643 at *7.

The California Court of Appeal denied these claims on the grounds that admission of the Harris's third statement was harmless beyond a reasonable doubt. *Id.* at *16. This was not "contrary to" clearly established federal law. *See* 28 U.S.C. § 2254(d)(1)(a). Claims under *Bruton* and *Crawford are* subject to harmless error analysis. *See United States v. Rashid*, 383 F.3d 769, 775-77 (8th Cir. 2004); *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004). The proper standard for harmless error on direct review is whether the error was harmless beyond a reasonable doubt. *Id.*

The Court of Appeal's conclusion that the error was harmless was also a "reasonable" application of federal law under 28 U.S.C. § 2254(d)(1). The Court of Appeal reasoned as follows:

> If Harris's statement were incriminatory of Lockhart only to the extent it confirmed that a second person was involved in the robbery, any error from its admission could only have been harmless as to Lockhart, even under the strict standard of *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (*Chapman* ),[] there being otherwise overwhelming evidence that two people were involved. However, Harris's

10

statement pointedly implies that his accomplice was the actual shooter, whoever that person might be. This fact was incriminating of Lockhart as no other evidence was. Indeed, Savage's testimony implied that Harris had been the shooter, and Coleman's was equivocal on this point.

   On the question of whether Lockhart aided and abetted a felony murder, there was no prejudice beyond a reasonable doubt. (*See Chapman*, supra, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.) Other evidence manifestly established that Lockhart had a motive to rob Brown, planned the robbery, and was present for its execution. Harris's third statement in no way served to buttress other evidence that Lockhart had been his accomplice. Once the jury concluded that Lockhart was an accomplice, the first degree felony murder verdict followed, without any reference to Harris's statement.

   The final question is whether Lockhart could have been prejudiced on the question of the special circumstance finding. (§ 190.2, subd. (a)(17)(A).) That is, if Harris's statement helped convince the jury that Lockhart was the actual shooter, could it have made a difference as to the findings that Lockhart acted with reckless indifference to human life and was a major participant in the crime? On the totality of the evidence, we are persuaded beyond a reasonable doubt that it could not. Since the jury concluded that Lockhart was Harris's accomplice, it must have done so because it credited the substantial evidence of Lockhart's motive and his orchestration of the robbery itself. Under these circumstances, the additional conclusion that Lockhart was also the shooter could not have influenced the determination that he had acted with reckless indifference to human life and was a major participant in the crime. Consequently, the error here was harmless.[]

*People v. Lockhart*, 2006 WL 1280643 at *16.

   This analysis was reasonable.  To begin with, Harris's statement did not directly implicate Petitioner.  At most, Harris suggested that there was an accomplice, but he did not identify Petitioner as that accomplice.  Moreover, as the Court of Appeal explained, the other evidence of guilt was very strong.  Coleman testified about Petitioner's repeated plans to rob Brown, about Petitioner's anger at Brown for having sex with Coleman (Petitioner's ex-wife), and about Petitioner's plan to use a gun.  She also testified that she lured Brown to the motel to set him up for Petitioner to rob him when Brown was robbed and killed, and that Petitioner called her after the crimes took place and admitted involvement in them.  Savage also identified Petitioner as one of the two men near Brown's car when Brown was shot.  In addition, property stolen from Brown

was found at a pawn shop in San Francisco that Petitioner had previously used.  Based upon this evidence, the California Court of Appeal could reasonably find beyond a reasonable doubt that Petitioner would have been convicted even without Harris's statement.  In addition, and for these same reasons, the statement did not have a substantial and injurious effect on the verdict, and therefore Petitioner cannot establish prejudice to obtain federal habeas relief.  *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (on federal habeas review, the harmless error standard applicable to Confrontation Clause error is whether inadmissible evidence had "substantial and injurious" effect on verdict) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

2.      Witness Threat Instructions

In his third claim, Petitioner contends that the trial court violated his right to due process by failing to instruct the jury that they could only consider evidence of threats to Boatley and Savage to assess their credibility and not to establish Petitioner's guilt.  He also argues that his Sixth Amendment right to counsel was violated by his attorney's failure to request such an instruction.

The California Court of Appeal described the evidence and its use at trial as follows:

1.      Background

Before trial, Lockhart moved to preclude the prosecutor from introducing certain evidence pertaining to Lockhart's brother, Michael. The prosecutor represented that evidence regarding Michael would be offered not to imply the guilt of defendant Lockhart, but to show that prosecution witness Savage had concerns about testifying due to his fear of Michael. The court deferred the matter to such time as Savage testified.

About three weeks later, the People sought a warrant for Savage's arrest, to secure his availability for trial. In support of the request, Sergeant Medeiros asserted that Savage had refused to testify because, since the preliminary hearing, Michael was asking about him around the neighborhood and he did not want to be killed. Savage also threatened to leave town. The warrant was issued.

Savage was brought to court the next day and stated: "I'm not going to testify on the grounds my life is being endangered." He

12

explained: "[w]hen the brother [Michael] was released out of prison, the first thing he did was went into a shop and started inquiring, 'Where is Enzore Savage?' And it got back to me before the detectives told me." Lockhart's counsel asserted that Savage should testify, and the judge ordered Savage to post a bond to ensure his return to court. Unable to post bond, Savage spent the night in jail and testified the next day.

2.    Evidence of Intimidation at Trial

At trial, Savage stated he was testifying against his will. He proceeded to recount the night of the incident, describing how Harris stood just outside Brown's white Lincoln, and Lockhart stood 20 yards away, yelling at Harris to leave. For the record, Harris's counsel remarked that Savage stared at an exhibit and did not look toward the defense table when asked to identify the suspects in court. The prosecutor added that Savage had been "testifying at an angle to these men since he began."

On cross-examination by Harris's counsel, Savage reiterated that he was brought to court to testify against his will. Asked if his unwillingness to testify was due to his fear of Lockhart or his family, Savage replied, "No. Yes." Asked if it was because he "fear[ed] ... the Lockhart family and not Mr. Harris," Savage answered, "Yes and no."

A few days later, Boatley testified. Among other things, she asserted that she was afraid and did not want to testify. She explained that a dead rat with a note attached to it reading, "Die, bitch," had been left on her home doorstep. On cross-examination by Lockhart's attorney, Boatley acknowledged that she had not received any threats from anyone she knew was acting on behalf of Lockhart. Deputy Wong corroborated Boatley's account, and a photograph of the objects left on her doorstep was introduced as well.

Next, the prosecution called inspector Ojala to the stand. The court advised the jury that his testimony could be considered only for a limited purpose: "THE COURT: This was a subject of our in-chambers session, and I think it has some limited relevancy, which would–*it's limited to the testimony of-I believe it's going to be limited to the testimony of Mr. Savage and how this might bear on his believability.* [¶] [THE PROSECUTION]: *And credibility.* [¶] THE COURT: *And credibility.*" (Italics added.)

Inspector Ojala then recounted Savage's reaction to the service of his arrest warrant, noting that he screamed, hollered, and said he was not going to court. Savage told Ojala that, since Michael Lockhart had been released from prison, Savage had received threats at his house. He was sure that, if he testified, he or his family would be killed.

3.    Lockhart's Further Objection and Court's Reference to Further Instruction

Outside the presence of the jury, Lockhart's attorney again objected to Ojala's testimony, on the grounds it improperly portrayed Lockhart as a

violent person (*see* Evid.Code, § 1101) and the probative value as to Savage's credibility was outweighed by the prejudice to Lockhart (Evid.Code, § 352). Counsel also pointed out there was no evidence Lockhart was involved in the witness intimidation.

The prosecutor countered that Savage, when testifying, expressed only a generalized fear, while Ojala's testimony showed "exactly what Mr. Savage was fearful of" and therefore was properly admitted to show Savage's state of mind and credibility. The prosecutor argued that, where a witness has been threatened yet continues to testify in a consistent manner, the evidence of threats is extremely probative as to the witness's credibility.

The court indicated that evidence of Savage's fear in testifying was relevant to his credibility and not inadmissible under Evidence Code section 352. The judge noted, "I also think this evidence not only explains his state of mind but his demeanor when he was testifying. He was seated and almost had his back turned to the Defendants, with his arms folded. Never made eye-to-eye contact with them." In addition, the court contemplated a further instruction of the jury: "I think the Court will give a limiting instruction. I plan to. And if you have some special instruction because there is, at this point, no evidence at all that your client, Mr. Eric Lockhart, is in any way involved, or has made any threats, you know, through his brother, certainly nothing directly, if he wants a special instruction to that respect, I'll certainly consider it, Mr. Sherrer [Lockhart's counsel]." No further limiting instruction was given or requested.

4.   Closing Argument

Harris's attorney argued that Savage identified Harris as the shooter because he was afraid of Lockhart's brother, Michael. Savage knew Lockhart was in the lineup, counsel contended, but refused to identify him because of his fear of Michael. She noted that Savage "wasn't going to come to court because he'd seen Michael Lockhart around, and he was scared to death." As to Savage's demeanor at trial, she remarked: "I want to point out that Mr. Savage was so frightened to come to court, he couldn't even face and look at Mr. Harris and Mr. Lockhart. He turned his head to the wall the whole time. And I submit to you, that fear is more than sufficient to have Mr. Savage switch who's by the car when he looks at them and who's 20 yards away going, 'Come on. Let's go.' " In addition, as to the witness intimidation against Boatley, Harris's counsel suggested Lockhart was responsible: "Eric Lockhart had the information to know where Lakisa Boatley was living to make sure that she had a dead possum and some feces on her step. [¶] And I submit to you, there's an inference delivered by the guy we heard about, Michael Lockhart, to scare her from testifying."

Lockhart's attorney did not object to Harris's arguments. In his own closing, he pointed out there was no evidence who left the items at Boatley's doorstep, and Savage's demeanor could have been due to his anger in being arrested rather than any fear of the defendants.

14

In rebuttal, the prosecutor clarified that the evidence of items left at Boatley's home was not to be considered as evidence of the defendants' guilt. Specifically, the prosecutor stated: "Now, Mr. Sherrer tried to down play the importance of Lakisa Boatley and the possum. I want to address the possum and why it's before you as evidence. It's not evidence that these men did it. It's stipulated they were in custody at the time that it occurred. [¶] What it's offered for, and the only way you consider it, and the reason you consider it, is you have to weigh the credibility of a witness that comes forward and testifies before you. If a witness has been intimidated and still speaks freely, honestly and says, this is what happened, even though she's been scared, intimidated, that's a factor for you to consider as to whether or not she's more credible anyway. [¶] She's terrified. Yet she feels the need to come forward and tell you the truth. That's why the evidence is admissible. That's why it's there. [¶] I'm not putting that possum on them. But we know that Ms. Boatley received it. That wasn't a prosecution ploy. The police didn't put it there. None of those things are the reason why that possum ends up on her door step. [¶] It's there because somebody is trying to scare her. And despite the fact that she's scared, she is still willing to testify and take the stand." (Italics added.) The prosecutor also refuted Lockhart's counsel's claim that Savage may have been angry just because he was arrested, noting that he told Ojala before he was arrested that he was afraid of Michael Lockhart.

*People v. Lockhart*, 2006 WL 1280643 at **16-19.

The California Court of Appeal found no error in the trial court's failure to instructions based on the following rationale:

Lockhart contends the court should have sua sponte given an instruction limiting the jury's use of witness intimidation evidence to their assessment of the credibility of Savage and Boatley. Such an instruction may be required where, as here, the evidence of witness intimidation is offered only to show its effect on the witness's credibility. (*See People v. Warren* (1988) 45 Cal.3d 471, 481, 247 Cal.Rptr. 172, 754 P.2d 218 [evidence of witness's fear in testifying is admissible as relevant to his credibility].)

As to Ojala's testimony about Savage's fear of Michael, the court did give a limiting admonition. The court advised the jury that his testimony regarding Savage's fear was admitted solely for the purpose of assessing Savage's believability and credibility as a witness. In addition, the jury was instructed in accordance with CALJIC No. 2.09, advising that evidence admitted for a limited purpose could not be considered for any other purpose. The jury is presumed to understand and follow the court's instructions. (*People v. Ballard* (1988) 203 Cal.App.3d 311, 320, 249 Cal.Rptr. 806.)

As to the intimidation of Boatley, the court did not expressly give a separate limiting instruction. However, Lockhart neither requested a further instruction nor reminded the court that it had indicated a further instruction would be given. In any event, any error in this regard was

15

harmless. Boatley admitted that she did not know of any threat from Lockhart himself, and the prosecutor told the jury that the evidence could be used solely for the purpose of assessing Boatley's credibility, not for establishing the defendants' guilt.

*Id.* at **19-20.

The state court's conclusion was neither contrary to nor an unreasonable application of federal law. A federal due process violation occurs only if the state trial court's failure to give an instruction so infected the trial that the defendant was deprived of a fair trial. *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). A habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given and by an examination of the record. *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

Petitioner's claim fails. First, the trial court did in fact give the limiting instruction when Ojala testified about Savage's fear of testifying. The trial court also gave an instruction that it could not consider evidence for any other purpose when a limiting instruction is given. The Court of Appeal correctly stated that the jury is presumed to follow such instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Secondly, the threat evidence was never used by the prosecution to show Petitioner's guilt. The prosecutor repeatedly and expressly argued to the jury that such evidence could only be considered to show that Boatley and Savage were credible. Lastly, the threat evidence was very weak on the issue of Petitioner's guilt. No evidence linked any threats to Petitioner himself: Savage only feared Petitioner's family, and Boatley stated that she did not know of any threat from Petitioner. Petitioner's family could just as plausibly want to stop witnesses from testifying against Petitioner whether or not Petitioner was actually guilty. Under these circumstances, the

absence of further limiting instructions about the threat evidence did not so infect the trial as to violate due process.

For the same reasons, there is no reasonable probability of a different verdict if counsel had requested further limiting instructions.  Therefore, his Sixth Amendment right to the effective assistance of counsel was not violated in this regard.  *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Accordingly, the state court's rejection of these claims was neither contrary to nor an unreasonable application of federal law, and it did not involve an unreasonable determination of the facts.  Petitioner is not entitled to habeas relief.

3.    Sufficiency of Evidence

In his fourth, fifth and sixth claims, Petitioner contends that there was insufficient evidence to support the jury's verdicts and findings.  These claims were raised in state habeas petitions, where they were summarily denied.  Petitioner cannot demonstrate that the state court's denial of these claims was contrary to, or an unreasonable application of, clearly established state law, or that it was based on an unreasonable determination of the facts.

Demonstrating entitlement to habeas relief based on a claim of insufficient evidence requires a substantial showing.  Because the Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged", *In re Winship*, 397 U.S. 358, 364 (1970), a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a constitutional claim.  *See Jackson v. Virginia*, 443 U.S. 307, 321-324 (1979).

The Supreme Court has emphasized, however, that "*Jackson* claims face a high bar in federal habeas proceedings . . ."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2062

(2012) (per curiam).  A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992);  *see also Coleman*, 132 S. Ct. at 2065.  Rather, the federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne,* 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319).  A due process violation may be found only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  *Jackson*, 443 U.S. at 324.  Furthermore, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any [] conflicts in favor of the prosecution, and must defer to that resolution." *Id*. at 326.  The court may not substitute its judgment for that of the jury, *see Coleman*, 132 S. Ct. at 2065, and under *Jackson*'s standard of review, a jury's credibility determinations are entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

In his fourth claim, Petitioner argues that there was insufficient evidence that he killed Brown, that he was armed, that he intended to kill Brown, or that he was recklessly indifferent to human life.  The prosecution's chief theory of guilt was felony-murder, and premeditated murder was presented as an alternate theory.  Under either theory, California law did not require a showing that Petitioner was the shooter because it was sufficient to show that Petitioner aided and abetted Harris if he was not the shooter.  *See* Cal. Pen. Code § 31.  Similarly, California law did not require a showing that Petitioner was armed, only that either he or Harris was armed.  *See* Cal. Pen. Code § 12022(a)(1).  Intent to kill was also not necessary to prove felony-murder, and in any even there was sufficient evidence of such intent: Coleman testified that Petitioner planned to rob Brown with a gun, her testimony showed a plausible motive for him to

kill Brown (i.e. Brown's sexual relationship with her), and Brown was shot multiple times even though he was not armed. Such evidence was also more than sufficient for a reasonable juror to find Petitioner's "reckless indifference" to Brown's safety, in addition to all of the evidence that he robbed Brown at gunpoint.

In his fifth claim, Petitioner argues that there was insufficient evidence of felony-murder because the robbery and murder were independent of each other. Under California law, Petitioner is guilty of felony-murder as long as there is a "logical nexus" between the felony and the killing; the purpose of this rule is to exclude killings that are "completely unrelated to" the felony. *People v. Cavitt*, 33 Cal. 4th 187, 198-99, 201-03 (2004). A rational fact-finder could find that Petitioner committed felony-murder based on Coleman's testimony that Petitioner planned to rob Brown at gunpoint, and the evidence that Brown was killed at the same time he was robbed. The prosecution's evidence all pointed to a killing that occurred during the commission of a planned robbery. There was no evidence that the killing occurred independently, let alone that it was "completely unrelated to" the robbery.[3]

In his sixth claim, Petitioner argues that there was insufficient evidence to support the jury's finding the special circumstance of robbery-murder. This finding requires proof that the murder was committed "in order to carry out or advance the commission of the robbery or to facilitate the escape therefrom or avoid detection." *See* Cal. Pen. Code § 190.2(a)(17). Just as there was sufficient evidence of felony-murder, there was sufficient evidence to support the same finding for purposes of the robbery-murder special circumstance.

Accordingly, Petitioner is not entitled to relief on these claims.

4.    <u>Ineffective Assistance of Counsel</u>

---

[3]Petitioner's additional argument in claim five — that there was insufficient evidence to prove the killing was done with malice — is without merit for the reasons discussed above in connection with the evidence of premeditation.

Petitioner claims that his attorney was ineffective because he failed to make the foregoing arguments about the insufficiency of the evidence. The Court has already explained why those arguments are without merit. It was neither unreasonable nor prejudicial for counsel to fail to meritless arguments. It was a reasonable strategic decision for counsel instead to challenge Coleman's testimony as based on a promise of leniency and Savage's identification as unreliable, and argue that Petitioner was not one of the perpetrators. *See generally Strickland*, 466 U.S. at 694. Accordingly, Petitioner is not entitled to relief on this claim.

5.   Savage's Identification of Petitioner

Petitioner claims that Savage's identification of Petitioner at the preliminary hearing and at trial were unduly tainted by impermissibly suggestive pretrial identification procedures. Petitioner also argues that counsel was ineffective in failing to object to the admission of the evidence.

On the night of the homicide, Savage described the two men he saw, but did not identify Petitioner. One week later, Savage identified Harris in a six-man lineup that did not include Petitioner. Two days later, Savage viewed a six-man lineup that included Petitioner; he did not identify Petitioner, and he put question marks over two other men. About three weeks later, however, he called Sergeant Medeiros after learning about Petitioner's arrest and told Medeiros that he had known Petitioner for about fifteen years and had recognized him in the lineup. He explained that he had not immediately identified Petitioner on the night of the shooting, but that he recognized him in the lineup and realized that he was the second man with Harris. He asked Medeiros if Petitioner had been in the number one position in the lineup; the answer was no, as Petitioner had been in the third position. Savage later identified Petitioner at the preliminary hearing and at trial.

Identification testimony is inadmissible as a violation of due process only if (1) a

pretrial encounter is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, and (2) the identification is not sufficiently reliable to outweigh the corrupting effects of the suggestive procedure. *Van Pilon v. Reed*, 799 F.2d 1332, 1338 (9th Cir. 1986).

There is no evidence that any aspect of the six-person lineup suggested or singled out Petitioner. Petitioner argues that his mere presence in the lineup suggested that the police believed he was guilty. There were six men in the lineup; his presence did not suggest that the police believed in his guilt any more than they believed in the guilt of the five others.

There is also no evidence of any suggestive conduct by the police prompting Savage's subsequent phone call to Medeiros, or any such suggestive conduct by the police between the time of the lineup and the preliminary hearing where Petitioner identified him. Petitioner asserts that when Savage identified Petitioner at the preliminary hearing, Petitioner was sitting alone at the defense table and wearing jailhouse clothing. A criminal defendant sitting alone at defense table at a pretrial hearing is not impermissibly suggestive. *See Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (identification procedures not unnecessarily suggestive where witness failed to identify defendant from photo spread but later made positive identification at pretrial suppression hearing). Petitioner also argues that Savage saw him in court with Harris before Savage testified at the preliminary hearing. Petitioner's being with Harris in court at the preliminary hearing does no more to suggest that the police suspect him than does his sitting at the defense table.

Moreover, the admission of Savage's identification of Petitioner, even if it were erroneous, did not have a substantial and injurious effect on the jury's verdict so as to cause prejudice under *Brecht*. *See* 507 U.S. at 637. Savage's identification of Petitioner was, moreover, cumulative of the stronger and more extensive evidence from

Coleman not only identifying Petitioner as one of the perpetrators, but also describing his planning and execution of the crimes.

Counsel was not ineffective in failing to object to the admission of Savage's identification of Petitioner because, as discussed above, such an objection would have been meritless and because there is no reasonable likelihood that admission of the largely cumulative identification evidence affected the outcome of the trial. *See Strickland*, 466 U.S. at 687-94.

For these reasons, the state court's rejection of this claim was neither contrary to nor an unreasonable application of federal law.

6.      Counsel's Cross-Examination of Savage

In his ninth claim, Petitioner argues that counsel's cross-examination of Savage was deficient because he did not adequately cross-examine him about his identification of Petitioner.  Ineffective assistance of counsel requires a showing that counsel's conduct was objectively unreasonable and prejudicial, meaning there was a reasonable probability that it effected the outcome of the trial. *Strickland*, 466 U.S. at 687-94.

The record shows that counsel conducted an extensive cross-examination of both Savage and Medeiros about the topics that Petitioner cites regarding Savage's identification of Petitioner.  Counsel raised Savage's failure to recognize Petitioner at the time of the incident or at the live lineup, Savage's subsequent phone call to Medeiros after Savage learned that Petitioner had been arrested, Savage's mis-identification of Petitioner's placement in the lineup, his failure to tell Medeiros earlier that he had known Petitioner for a long time, and his failure to identify Petitioner until the preliminary hearing.  Counsel also cross-examined Medeiros about Savage's phone call to Medeiros and his delay in identifying Petitioner.  This amounted to an extensive and thorough cross-examination that effectively called into question the value of Savage's identification of Petitioner at the preliminary hearing and at trial.  The

problem for Petitioner was, of course, that Coleman had already identified Petitioner and described his role in the crime in greater detail.

Petitioner complains that counsel failed to elicit the fact that Savage had learned from the news that Petitioner had been arrested when he made the follow-up call to Medeiros, but counsel did cross-examine Savage about calling Medeiros after learning that Petitioner had been arrested. Petitioner also complains that counsel failed to elicit the fact that Petitioner was in prison clothing when Savage identified him at the preliminary hearing, and that Savage had seen Petitioner with Harris in court. The omission of this topic is insignificant in light of counsel's otherwise thorough cross-examination of Savage and Medeiros, and the problems that counsel exposed in Savage's identification of Petitioner via that cross-examination.

Furthermore, any shortcomings in counsel's cross-examination about Savage's identification of Petitioner was not prejudicial because, as discussed above, Savage's testimony largely cumulative of other, stronger evidence identifying Petitioner as one of the perpetrators.

The state court's rejection of this claim was neither contrary to nor an unreasonable application of federal law, nor did it involve an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on this claim.

7.   Jury Bias and Transcripts

In his tenth claim, Petitioner contends that the prosecutor violated his constitutional rights by using peremptory challenges to exclude black and minority jurors. The problem with this claim is that it consists of one conclusory paragraph with no explanation as to which prospective jurors or how many were improperly challenged, whether any black and minority jurors remained on the panel, or whether the prosecutor had any non-discriminatory reasons for the challenges. The transcript of the voir dire, lodged herein, does not reveal any prima facie case of discriminatory use of peremptory

challenges.

In his eleventh claim, Petitioner asserts that the state courts and appellate counsel improperly failed to provide him with voir dire transcripts and jury questionnaires when he requested them for his state habeas petitions.  To begin with, there is no clearly established federal law, within the meaning of 28 U.S.C. § 2254(d)(1), that he has a constitutional right to transcripts for purposes of collateral review.[4]  Indeed, errors in the state post-conviction review process are not addressable through federal habeas corpus proceedings.  *See Ortiz v. Stewart*, 149 F.3d 923, 939 (9th Cir. 1998).  Moreover, like his tenth claim, this claim consists of one brief and conclusory paragraph with no explanation or argument as to what improper peremptory challenges he could show if he had the transcripts and records.  If Petitioner knows of any that peremptory challenges that were made improperly, he could have described them even without the transcripts and records, and he has not done so.  If he cannot allege what improper challenges were made, then he is simply speculating that some might be revealed by the record; such speculation is not sufficient to state a cognizable grounds for habeas relief.  In any event, the voir dire transcripts are part of the record that has been lodged with the Court in this case, and it reveals no prima facie case of improper peremptory challenges.  The jury questionnaires were given to defense counsel, and Petitioner has not explained why he did not or could not obtain them from him.

Petitioner has not shown that the state court's denial of his tenth and eleventh claims were contrary to or an unreasonable application of federal law or involved an unreasonable determination of the facts.  He is not entitled to relief on these claims.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

---

[4]While a state court may not deny transcripts for direct review to indigent prisoners when they provide them to paying appellants, Petitioner here does not allege that they were denied based on his indigence, and he was not pursuing direct review.

Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: March 26, 2013

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

ERIC LOCKHART,

          Plaintiff,

  v.

TONY HEDGPETH et al,

          Defendant.

_____/

Case Number: CV08-02935 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 26, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Eric Lockhart V-17246
P.O. Box 3461
Corcoran, CA 93212

Dated: March 26, 2013

*Jennifer Ottolini*

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk

26